IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

OPINION AND ORDER

Plaintiff,

v.                                                                08-cv-565-slc

OLSTEN STAFFING SERVICES CORP.,

Defendant.

---

This case raises questions about the scope of an employment agency's obligations under the Americans with Disabilities Act. Zachary Schaefer is a deaf person who sought employment unsuccessfully through defendant Olsten Staffing Services Corp. Plaintiff United States Equal Opportunity Commission identifies three alleged discriminatory acts taken by Olsten:

(1) Flagging Schaefer's hearing impairment to a potential employer (Main Street Ingredients) and identifying the disability as a potential reason for "hesitation" and "concern," even though Schaefer was qualified for the job and nothing in the job requirements suggested that a hearing impairment would be a problem;

(2) Failing to take corrective action when Main Street rejected Schaefer's placement without explanation; and

(3) Refusing to refer Schaefer to Main Street when additional positions became available two months later and giving Schaefer false information about the reason for doing so.

Olsten has moved for summary judgment on the EEOC's claims. Dkt. 28. Because a reasonable jury could find that each of the alleged discriminatory acts violated the ADA, I must deny Olsten's motion for summary judgment motion.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed:

UNDISPUTED FACTS

Zachary Schaefer has suffered from profound hearing loss in both of his ears since birth. Although he can perceive vibrations of nearby, extremely loud noises, he cannot hear any sounds. Schaefer holds an Associates degree in culinary management and a Bachelor of Science degree in Hotel, Restaurant and Tourism Management. In February 2007, Schaefer applied to work as a temporary food production employee at Main Street Ingredients in La Crosse, Wisconsin. Main Street referred Schaefer to defendant Olsten Staffing Services Corp., an employee staffing agency through which Main Street hired its temporary employees.

The production job was an entry-level position primarily involving physical labor, such as lifting bags and pouring the contents of those bags into machines. Unimpaired hearing was not a requirement for the job so long as the employee's vision was unimpaired. Schaefer's vision was unimpaired and he met all physical requirements of the job.

Noise levels at the facility are so high that employees are required to wear hearing protection to block out the noise. As a result, Main Street has safety measures in place to enable employees to be visually alert to their surroundings. These measures include using forklifts in relatively open areas and equipping them with flashing orange lights, placing mirrors in the facility to allow employees to see objects approaching from around corners and using visual alarm systems such as strobe lights. These measures would allow a deaf person to work safely at the facility.

Schaefer registered with Olsten on March 1, 2007. He received a handbook stating that temporary employees are paid by Olsten, submit time cards to Olsten and are subject to Olsten's policies and procedures. In addition, it states: "Although you will be doing work for a variety of Olsten clients, we are your employer."

Kristine Boehme, Olsten's staffing specialist assigned to Main Street, believed that Schaefer was qualified for a production position at Main Street. Generally, Boehme sent a "survey sheet" to candidates she believed were qualified to work for Main Street. It included yes or no questions, such as whether the candidate could lift 50 pounds. Once a candidate completed the sheet, Boehme would send it to Main Street. If Main Street did not object to the candidate within a day or so, then Boehme would schedule the candidate for a tour of the Main Street facility. After that tour, the candidate could begin working.

Boehme did not send a survey sheet to Schaefer. Instead, she sent an e-mail dated March 5, 2007 to Main Street in which she wrote the following:

> We had an applicant in who was referred to us by Cheryl. He wants to work out in the production area but our only hesitation is that he is deaf. Would we be able to place him or is that too much of a concern for you? He has a good work history and can handle the lifting. Please let me know what your thoughts are on that.

Main Street responded, "I would have to say no. not at this time." Schaefer did not receive an assignment at Main Street.

In May 2007 Olsten received another order from Main Street for temporary employees. Boehme notified Schaefer, who told Boehme that he was interested. On May 15, Boehme called

Schaefer using an internet protocol relay service.[1]  Boehme told Schaefer that Main Street did not want Schaefer to work there because of the need to hear forklifts.

Later in the day, Schaefer e-mailed Boehme, asking her to clarify the reason he was not being assigned to Main Street. In response, she wrote:

> At the plant the hallways are very narrow and the forklifts go by quite fast so they are worried that because you wouldn't be able to hear them they might hit you.  I understand what you said about being conscientious of your surroundings by sight but unfortunately they need you to be able to hear the horn of the forklift.

The information Boehme provided in the telephone conversation and e-mail was false.  Boehme had no knowledge that anyone at Main Street had a concern about Schaefer's inability to hear the forklifts.

Schaefer did not receive a work assignment at Main Street.

Olsten did not have the authority unilaterally to place an employee at Main Street.  Main Street, however, generally accepted Olsten's referrals.  Olsten did not contact Main Street to discuss reasonable accommodations for Schaefer.  Olsten's human resources documents identify actions that it can take when clients attempt to place discriminatory work orders, including making sure that the representative has correctly understood what the client wants, asking the client for reasons it feels it needs or wants to avoid a particular kind of person, explaining the law and Olsten's EEO policies to the client, "gently educat[ing the client] about their potential liability" and contacting Olsten's employee relations department for additional assistance.

---

[1] IP Relay is a service through which a hearing impaired individual may place a telephone call to a hearing individual by accessing the internet and using an operator as an intermediary.

OPINION

The central provision in the Americans with Disabilities Act contains this prohibition:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C.A. § 12112.

For the purpose of summary judgment, there is no dispute that Olsten is a "covered entity" (because Olsten was Schaefer's "employer" and his "employment agency," which are both "covered entities," 42 U.S.C. § 12111(2)), and that Schaefer is a "qualified individual" (because he is able to perform the requirements of a production worker with or without an accommodation). The dispute is whether Olsten "discriminate[d] against" Schaefer "on the basis of disability."

Olsten devotes much of its opening brief to the argument that the EEOC cannot prevail on a theory that Olsten failed to "place" Schaefer at a job because Main Street Ingredients had the final say regarding whether to hire Schaefer. Under the ADA, the question is not as narrow as whether Olsten failed to guarantee a job for Schaefer or even whether it failed to refer him. The question is whether Olsten discriminated against Schaefer in a manner that falls within the ambit of statute, which defines discrimination to include

> participating in a contractual or other arrangement or relationship that *has the effect* of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency . . .).

42 U.S.C. § 12112(b)(2)(emphasis added).

*See also Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1341 (DC Cir. 1973) ("Congress has determined to prohibit [an employment agency] from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him.")

It is true that the EEOC identified "failing to place" as an alleged discriminatory act in its complaint, dkt. 1, ¶10, but Olsten does not argue that the EEOC's complaint failed to provide it with adequate notice of the allegations raised in opposition to Olsten's motion for summary judgment. Thus, Olsten identifies no reason to restrict the EEOC's claim so narrowly.

Two periods of time are issue in this case, March 2007 and May 2007. Olsten says it complied with the ADA in March 2007 because it referred Schaefer to work at Main Street at that time and that it complied in May 2007 because it would have been futile to refer Schaefer to work at a company that "had already informed Olsten that it could not accommodate Schaefer just two months earlier." Def. Br., dkt. 76, at 15. Olsten's characterizations of what happened are debatable. It is not clear that Olsten's contact with Main Street regarding Schaefer in March 2007 constituted a referral or that Main Street informed Olsten that Schaefer could not be accommodated. Rather, the facts in the record would allow a reasonable jury to find that Olsten's actions in both instances violated the ADA. Let's break this out:

**I. March 2007 Incident**

There is no dispute that in March 2007, Olsten *identified* Schaefer to Main Street, but it is questionable whether Olsten's actions can be described accurately as a referral or a

6

recommendation. The EEOC has submitted an e-mail dated March 5, 2007 from Olsten's staffing specialist to Main Street in which she stated:

> We had an applicant in who was referred to us by Cheryl. He wants to work out in the production area but our only hesitation is that he is deaf. Would we be able to place him or is that too much of a concern for you? He has a good work history and can handle the lifting. Please let me know what your thoughts are on that.

Main Street responded, "I would have to say no. not at this time."

Olsten argues vigorously that this e-mail is not properly before the court because the EEOC failed to authenticate it and because it is hearsay. In response, the EEOC has moved to "strike" these arguments because Olsten raised them for the first time in its reply brief. Dkt. 88. Alternatively, the EEOC seeks permission to respond to Olsten's arguments against admission. Assuming that Olsten's evidentiary arguments were properly raised in its reply brief, it would be unfair to consider these arguments without allowing the EEOC an opportunity to respond. Having considered both parties' arguments, I conclude that this e-mail is admissible evidence that the court may consider when deciding Olsten's summary judgment motion.

The EEOC authenticates the e-mail through the testimony of Sue Horne, who is the human resources manager for Main Street Ingredients and who personally retrieved the e-mail from Main Street's computer. Olsten argues that only the *author* of the e-mails may authenticate them, but cites no authority for this proposition and assumes incorrectly that a witness must have personal knowledge of the *contents* of a document in order to authenticate it. If Olsten were correct, then e-mails would be inadmissible in any case in which the purported author denied their accuracy. The rules of evidence are not so punctilious.

7

Under Fed. R. Ev. 901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *See also Thanongsinh v. Board of Educ.*, 462 F.3d 762, 779 (7th Cir. 2006) ("Rule 901 does not erect a particularly high hurdle.") Thus, to authenticate the e-mail, the EEOC need only adduce evidence that the document is an e-mail between Olsten and Main Street, not that the contents of the e-mail are the actual thoughts of the author. Testimony from someone who personally retrieved the e-mail from the computer to which the e-mail was allegedly sent is sufficient for this purpose. *United States v. Hampton*, 464 F.3d 687, 690 (7th Cir. 2006) (custodian of record may authenticate). Further, as the EEOC observes, even without a custodian, e-mails may be authenticated through the e-mail addresses in the headers and other circumstantial evidence, such as the location where the e-mail was found. *United States v. Vaghari*, 2009 WL 2245097, *8-9 (E.D. Pa. 2009); *United States v. Safavian*, 435 F. Supp. 2d 36, 39-42 (D.D.C. 2006).

Olsten observes that Horne admitted in her deposition that the copy of the e-mail attached to her declaration is not an exact copy of the e-mail she retrieved (because other e-mails from different dates had been included in the exhibit). However, to the extent this might pose an authentication problem, the EEOC solved it by citing to an exhibit from Horne's deposition that she *does* testify is an exact copy of the e-mail she retrieved. Unable to challenge the authenticity of this exhibit, Olsten argues that it is too late for the EEOC to salvage the March 5, 2007 e-mail as an exhibit because the EEOC did not submit the "correct" version with its original summary judgment materials. (Horne was not deposed until after the EEOC filed its opposition to Olsten's summary judgment motion.) Olsten's tenacity is remarkable but its

argument is scant basis for excluding a highly relevant document of which both sides long have been aware.  It would not serve the interest of justice to grant summary judgment on the ground that the EEOC failed timely to submit a more clearly admissible version of a document when this document is present in the record and is offered while Olsten's summary judgment motion is pending.  *See Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)(courts should not rest summary judgment motions on technicalities about the admissibility of evidence but should determine whether the opponent has a reasonable prospect of prevailing before a reasonable jury); *cf. Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920-21 & n. 2 (7th Cir. 1994) (in opposing motion for summary judgment, nonmovant "need not tender evidence in a form that would be admissible at trial" so long as it is "a *kind* [of evidence] admissible at trial"); 10A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2728 ("[T]he court has discretion to deny a Rule 56 motion . . . even though the summary judgment standard appears to have been met . . . when it has any doubt as to the wisdom of terminating the action prior to a full trial.")

      Olsten next attacks the exhibit as inadmissible hearsay.  Olsten focuses on the e-mail from Main Street, arguing that it does not fall into the hearsay exception for admissions by a party-opponent under Fed. R. Ev. 801(d)(2).  This is true, but irrelevant.  The e-mail from Main Street is not hearsay because the EEOC is not offering it for the truth of the matter asserted by Main Street, *see* Fed. R. Ev. 801(c), but for the effect the e-mail had on Olsten.  *United States v. Inglese*, 282 F.3d 528, 538 (7th Cir. 2002) (out-of-court statement not hearsay when offered to show effect it had on listener).  Olsten does not challenge Boehme's e-mail on hearsay grounds, presumably due to Rule 801(d)(2)(D).

9

Next, Olsten asserts that Boehme "disputes the substance of the alleged e-mail." Dft.'s Br., at 10, dkt. 76. This assertion is inaccurate and unhelpful. Inaccurate because Olsten points to no testimony in which Boehme denied the contents of the e-mail. Rather, when asked during her deposition whether the e-mail was hers, she initially said, "I believe so." Dkt. 58, at 160. Although she changed her testimony after counsel objected, even then she admitted that she sent an e-mail identifying Schaefer's disability to Main Street, but she said that she did not remember what words she used. *Id.* at 161-67. Regardless, the assertion is unhelpful because the most Boehme's testimony could establish is a dispute over a material fact that would render summary judgment inappropriate.

Finally, Olsten argues in a footnote that the e-mail should be stricken because the EEOC did not disclose Horne as a potential witness before summary judgment. This undeveloped argument is unpersuasive, particularly because Olsten had *deposed* Horne by the time it objected to the admissibility of the e-mails. It is difficult to imagine any unfair prejudice that Olsten would have suffered as a result of any untimely disclosure. *See* Fed. R. Civ. P. 37(c)(1)(A) (exclusion of witness testimony for failure to disclose not required when failure was harmless). The bottom line is that the Boehme's e-mail is admissible evidence that the court will consider in deciding Olsten's motion for summary judgment.

The leads to the substantive question: is this e-mail evidence that Olsten "discriminate[d] against" Schaefer "on the basis of disability"? The EEOC argues that it is because it shows that Olsten treated Schaefer differently from other applicants. Generally, Boehme sent a "survey sheet" to applicants she believed were qualified to work for Main Street and then sent the completed sheet to Main Street. If Main Street did not object to the employee within a day or

10

so, then the candidate could begin working. It was not Olsten's general practice to raise with Main Street characteristics of a particular applicant or contact Main Street to ask whether that applicant presented a "concern."[2] In this sense, the EEOC's evidence suggests that Olsten "discriminate[d] against a qualified individual on the basis of disability in regard to job application procedures [and] hiring." 42 U.S.C. § 12112(a). *See also* 42 U.S.C. § 12112(b)(1) (discrimination includes "limiting, segregating, or classifying a job applicant . . . in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant "); § 12112(b)(3)(discrimination includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability").

If we were to replace the word "deaf" in Boehme's e-mail with "African-American" or "female," it would not be unreasonable to infer discriminatory intent from an employer's statement that this immutable characteristic was cause for "hesitation" and "concern." Further, because it is undisputed that Olsten wielded significant influence over Main Street's hiring decisions–Main Street accepted almost all the candidates Olsten referred–a reasonable jury could find a causal connection between the discriminatory treatment and Schaefer's failure to receive the assignment. *Cf. Staub v. Proctor Hospital*, 560 F.3d 647, 651 (7th Cir. 2009) (discriminatory intent of nondecision maker may be imputed to decision maker when nondecision maker has "singular influence" over decision maker).

---

[2] The EEOC has moved to strike a supplemental declaration by Boehme that Olsten submitted with its reply brief in which Boehme provides one other example of contacting Main Street directly about a candidate instead of sending a survey sheet. Dkt. 88. It is not necessary to strike Boehme's declaration because it does not contradict her earlier statement that it was her general practice to send the sheets.

Olsten explains that it had a legitimate reason to flag Schaefer's disability, which is that it needed to determine whether Main Street could accommodate the disability. At least at the summary judgment phase, this explanation will not suffice to avoid a trial. First, nothing in the e-mail or Boehme's testimony suggests that she actually was trying to investigate the need for or possibility of accommodation. The question was whether Schaefer's hearing impairment would be a "concern;" the word "accommodation" or an equivalent was not mentioned. After all, there is no evidence that Olsten believed that Schaefer needed any accommodation, much less that Main Street would be unable to accommodate him. It is undisputed that Schaefer was qualified for the job and that Main Street had given Olsten no information suggesting that a deaf person would be unable to perform the job's essential functions.

It is impermissible to assume without a factual basis that a person's disability is a reason for denying a job simply because the ADA allows employers to take a person's disability into account in limited circumstances. Under Title VII, even a person's sex or race can be a lawful consideration in some cases, 42 U.S.C. § 2000e-2(e) (sex as bona fide occupational qualification); *United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979) (affirmative action plans), but this does not allow an employer to assume that a person may be denied a job because of his race or sex until it is proven otherwise. Accordingly, I conclude that a reasonable jury could find that Olsten's handling of Schaefer's application violated the ADA. After considering all the relevant evidence and making credibility determinations, the jury might choose to accept Olsten's explanation as to what Boehme was trying to accomplish, or it might choose to reject it. But it is a jury question that cannot be resolved on summary judgment.

Even assuming, *arguendo*, that Olsten's e-mail would not constitute discrimination on its own, this would not defeat the EEOC's claim. As Schaefer's employer, Olsten had a duty under the ADA to protect Schaefer from discrimination by its clients. *Erickson v. Wisconsin Dept. of Corrections*, 469 F.3d 600, 605 (7th Cir. 2006) (with respect to employer's duty to prevent discrimination "[w]hether [it comes from] an employee, independent contractor, or even a customer is irrelevant"). "The genesis of inequality matters not; what does matter is how the employer handles the problem." *Dunn v. Washington County Hospital*, 429 F.3d 689 (7th Cir. 2005). The parties agree that the standard is negligence, so the question is whether Olsten knew or should have known of the discrimination and whether it took reasonable corrective action within its control. *Erickson*, 469 F.3d at 606; *see also* 29 C.F.R. § 1604.11(e).[3]

A reasonable jury could find that Olsten knew or should have known that Schaefer likely was the victim of discrimination on the basis of his disability: the only information that Main Street had about Schaefer was that he was qualified for the job and that he was deaf. It does not require an inferential leap to determine that Schaefer's hearing impairment was the reason that Main Street rejected Schaefer.

Olsten seems to concede that it would be in trouble if it had treated an applicant's race or sex the way that it treated Schaefer's disability. It tries to distinguish its conduct from a situation in which a staffing agency complies with an instruction from a client not to "refer any women for temporary employment." Dft.'s Br., at 8, dkt. 29. Olsten says that, in Schaefer's case, "nothing Main Street said or did suggested that it was intentionally violating the law"

---

[3] These standards are derived from cases involving hostile work environments, but neither party identifies a reason to believe that the standard in a disparate treatment case should be any different.

13

because Main Street may have rejected Schaefer on the ground that it could not accommodate his disability. *Id.*

At this stage, Olsten's distinction is not persuasive. Again, like a person's gender, a person's disability is protected from employment discrimination except in limited circumstances. Although disability will be a permissible consideration more often than gender, there is no presumption in the law that disabled people are unqualified to work; to the contrary, the ADA requires employers to presume the opposite. In this case, it is undisputed that Main Street gave Olsten no information that would support a belief that Schaefer's hearing impairment would prevent him from performing the duties of a production worker and Olsten had no independent knowledge that would have supported such a belief. This left no logical explanation for Main Street's decision except a disinclination to hire Schaefer because he was deaf. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-90 (1999) (one purpose of ADA is to protect those "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities") (quoting 29 CFR pt. 1630, App. § 1630.2). In light of the strong inference of Main Street's disability discrimination, Olsten could not just bury its head in the sand. *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) ("Going out of your way to avoid acquiring unwelcome knowledge is a species of intent.")

Turning to the second part of the negligence standard, Olsten argues that it took appropriate corrective action by attempting to find Schaefer another assignment. There are two problems with that argument. First, it is disputed whether Olsten attempted to find Schaefer another position. Olsten points to only one instance in its proposed findings of fact in which it says it called Schaefer about a position with another client, Dft.'s PFOF ¶41, dkt. 30, but

14

Schaefer denies that Olsten discussed a job opportunity with him during that conversation. In any event, circumvention does not equal "corrective action." Olsten points to no language in the ADA or the case law that would allow an employer to "correct" one discriminatory act by offering an applicant a different job opportunity. For example, an employer may not tell an African-American applicant, "The position you applied for is reserved for white people, but I can offer you another position that is just as good." *Each* employment decision must comply with the law. *E.g., Lust v. Sealy*, 383 F.3d 580 (7th Cir. 2004) (affirming jury verdict for sex discrimination in case in which plaintiff was denied one promotion but received similar promotion two months later).

Finally, Olsten correctly notes that disabled individuals are not entitled to the accommodation of their choice, *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011,1017 (7th Cir. 1996), but this is an irrelevant observation in this situation. This lawsuit is not about whether Olsten failed to provide Schaefer a reasonable accommodation. The evidence shows that Schaefer did not need an accommodation and he had not requested one. Attempting to find Schaefer another job (assuming Olsten did this) would not "accommodate" Schaefer's disability, it would "accommodate" Main Street's discriminatory attitude.

A recurring theme in Olsten's briefs is that permitting a case like this one to go forward will create an "impossible and unfair burden on employment agencies." Dft. Br., dkt. 29, at 4. This argument is based on an incorrect premise, namely that the EEOC seeks to hold Olsten liable for matters outside its control. The EEOC's theory is not that Olsten failed to guarantee a placement for Schaefer, but that it facilitated discrimination through its own acts and omissions. This is the EEOC's burden to prove at trial in order to prevail.

15

Olsten's view, while understandable from its perspective as the defendant in a discrimination lawsuit, is problematic from a broader perspective because it suggests that employment agencies cannot be held accountable under the ADA unless they have unilateral authority to place or reject an applicant. This would make the ADA's inclusion of employment agencies largely superfluous because there are few situations in which an agency's client does not have the authority to reject a proffered employee. In addition, Olsten's view would allow employment agencies to avoid liability no matter how many discriminatory actions they took so long as the "final decision" on placement could be attributed to the client. Such a result would be inconsistent with the language and purpose of the ADA.

**II.  May 2007 Incident**

In light of my conclusion regarding the March 2007 incident, it follows that Olsten's motion for summary judgment must be denied with respect to the May 2007 incident as well. It is undisputed not only that Olsten declined to refer Schaefer to Main Street when a new position opened up, but also that Olsten invented a justification for that decision with no basis in fact. Olsten's only explanation now for failing to refer Schaefer in May is that Main Street "had already informed Olsten that it could not accommodate Schaefer just two months earlier." Dft. Br., dkt. 76, at 15.

This is an inaccurate characterization of what happened. The facts show that Main Street said nothing to Olsten about being unable to accommodate Schaefer. Thus, a reasonable jury could interpret Olsten's fabricated explanation to Schaefer as a decision not to refer Schaefer on the basis of his disability. Even if Olsten believed in good faith that Main Street

16

could not accommodate Schaefer, this would not relieve Olsten of the obligation to take reasonable corrective action.

### III. Punitive Damages

Olsten seeks to strike the punitive damages claim from the complaint. A claim for punitive damages is as susceptible to summary judgment as any other claim, *see, e.g., Malone v. Reliastar Life Ins. Co.*, 558 F.3d 683, 694-95 (7th Cir. 2009), but only if the movant meets the usual requirements of Rule 56. Here there are genuine factual disputes as to whether Boehme can be characterized accurately as a manager, whether she acted with the requisite mental state and whether her actions can be attributed to Olsten so as to support an award of punitive damages. Accordingly, summary judgment is not appropriate on this claim. We can revisit this issue at the close of evidence at trial.

ORDER

IT IS ORDERED that:

1. The motion filed by the EEOC to "strike" materials submitted with defendant Olsten Staffing Services Corp.'s reply brief, dkt. 88, is DENIED as unnecessary.

2. The motion for summary judgment filed by Olsten Staffing Services Corporation, dkt. 28, is DENIED.

Entered this 28th day of September, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge